JOHN D. GILLETT

*v.*

JOHN E. WILEY.

*Filed at Springfield June 18, 1888.*

1. GUARDIAN AND WARD — *surety on guardian's bond — transactions between guardian and ward.* From the confidential relation between a guardian and his ward, it will be presumed that the ward acts under the influence of the guardian, and all transactions and dealings between them, prejudicially affecting the interests of the ward, will be held to be constructively fraudulent. This presumption continues even after the guardianship has ended, when the matters between the guardian and ward have not yet been fully settled; and transactions between them during the presumed influence, which are injurious to the interests of the ward, will be set aside, unless shown to have been the deliberate act of the ward, after full knowledge of his rights. In all such cases, the burden rests upon the guardian to prove the circumstances of knowledge and free consent on the part of the ward, good faith and absence of influence, which alone can overcome this presumption.

2. To bind the ward in a transaction with his guardian, it must be shown that he acted, after the termination of his disability, with deliberation, and with full knowledge of all material facts.

3. In this case a guardian had given a mortgage on his land to indemnify his surety. The ward resided in the guardian's family from eight years of age to his majority, and was ignorant, and of a weak mind. After his majority, his guardian woke him from a sleep, and procured him to sign a receipt in full, there being no settlement or payment of any money, on the false assurance that he was signing a note as his guardian's surety. On this receipt the guardian, without notice to the ward, procured his discharge from the county court, and the release of the mortgage from his surety. The ward had no knowledge who was surety on his guardian's bond, or that he had taken a mortgage as indemnity from his guardian, and had no purpose to aid his guardian in perpetrating a fraud on his surety, but was himself the victim of imposition and fraud: *Held,* that the ward was not estopped, by the giving of the receipt in ignorance of what it was, from showing that his guardian had not paid him, and asserting his rights against the surety. In such case, the ward owed no duty to the surety.

4. SAME — *finding by county court as to amount in guardian's hands — how far conclusive.* An order of the county court finding the sum in a guardian's hands belonging to his ward, after the majority of the latter,

and ordering its payment to the ward, is conclusive upon the guardian and his surety, except for fraud or mistake, as to the amount then actually in the hands of the guardian.

5. SAME—*discharge of guardian by county court, upon fraudulent testimony — whether conclusive.* Where the amount of money in the guardian's hands belonging to his ward is ascertained after the ward becomes of age, and the guardian is directed to pay the same to him, before the county court can enter an order discharging the guardian it must appear to that court that the guardian has complied with its former order. If such final order is procured without notice to the ward, on a forged receipt, or one obtained by fraud and circumvention, it can not avail to discharge the guardian, or his surety on his bond.

6. A receipt given by a ward, after his majority, in full of the sum due him from his guardian, is *prima facie* evidence that the latter had, on or before its date, paid him the sum therein named, but is not conclusive. Like any other receipt, it is open to explanation or contradiction.

7. So where a guardian procures his ward, even after the latter has attained his majority, to sign a receipt in full of the moneys in his hands, by falsely representing to the ward that the paper presented was a note which he wished him to sign as surety, and the ward signs the same without reading it, and by means of such false and fraudulent receipt the guardian procures an order of discharge from the county court without any notice to the ward, when, in fact, no settlement was ever made with the ward and no money was paid him, these facts may be shown in a suit upon a guardian's bond, and will be sufficient to fix the liability of the surety of such guardian.

8. A guardian owes his ward a duty which can be discharged only by performance of the condition of his bond, and no one except the ward has power to release the obligation of the guardian or his surety.

9. While full faith and credit must be given to the public records, and those relying upon and dealing in view of them will ordinarily be protected, the record of the discharge of a guardian by the county court will not protect the guardian, or the surety on his bond, if such order is procured by the fraud of the guardian.

10. SURETY—*surrendering his indemnity—negligence in so doing.* A surety upon a guardian's bond, upon the faith of an order, procured by fraud, discharging the guardian, released a mortgage taken from the latter as an indemnity against loss. The order of discharge was procured by a receipt signed by the ward upon the false assurance that it was a note of the guardian. The ward was an inmate of the guardian's family, and could readily have been seen by the surety, but was not inquired of on the subject: *Held,* that the surety was guilty of negli-

gence in releasing his mortgage, and should have known that the order of the county court was liable to be set aside for fraud, or any infirmity in the dealing between the guardian and the ward, and that he was not released from his obligation as surety.

11. LIMITATION—*when the statute begins to run—in case of fraud.* In case of fraud, the limitation will begin to run only from the discovery of the fraud, or from the time when the fraud could have been discovered by the exercise of reasonable diligence. But the failure to use such diligence may be excused when there exists a relation of trust and confidence between the parties, rendering it the duty of the party committing the fraud to disclose to the other the truth, and where it was through the acts of the former that the latter was induced to refrain from inquiry.

12. SAME—*in suit on guardian's bond—in equity.* Courts of equity, in considering the rights of a ward as against a surety on his guardian's bond, will, unless there is some equitable reason for the adoption of a different period, adopt the limitation fixed by the statute.

13. A suit in equity on a guardian's bond was brought by the ward about twelve years after he attained his majority, in which it appeared the ward, who was of a feeble mind, had, from his boyhood, resided, and, after his majority, continued to reside, with the guardian, who had complete control of him, and it appeared the rights of the ward were concealed from him until shortly before the filing of the bill: *Held,* that the ward was not barred by *laches.*

14. ESTOPPEL *in pais—equitable basis of the rule.* The doctrine of *estoppel in pais* is never applied, except when it would be contrary to equity to allow the assertion of the right or proof of the fact to avail. It is never applied to one who is without fault, or who has not, by act or declaration, or by silence when he should speak, induced another to alter his condition on the faith of such acts or the truth of such declarations. The facts which give rise to such estoppel must be such as to make it unjust and inequitable to allow the party estopped to assert that which would otherwise be his right, or make proof of matters tending to establish such right.

15. It is not essential to the creation of an estoppel, that there should be actual fraudulent intent at the time of making the declarations or performing the acts upon which the other party has relied, but it is essential that there should be voluntary acts or declarations by which another is made to believe in the existence of certain facts, which induce him to act upon that belief.

16. SAME—*as between the ward and surety on guardian's bond.* The surety on a guardian's bond undertakes for the fidelity and honesty of his principal toward his ward, and when the guardian, by means of fraud and circumvention, procures his ward to execute an instrument.

in writing as an acquittance, in the belief it is something else, whereby the guardian is enabled to defraud his surety, the doctrine of estoppel can not be invoked by such surety to prevent the ward from asserting his legal rights.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Logan county; the Hon. GEORGE W. HERDMAN, Judge, presiding.

This is a bill in chancery, filed in the circuit court of Logan county, by John E. Wiley, against Joshua Day and John D. Gillett, to set aside the discharge of said Day as guardian of Wiley, entered by the county court of that county, and for a decree against Day and Gillett for the sum due to complainant, as shown by the report of said Day, as guardian of Wiley, June 22, 1869, and interest thereon.

On March 23, 1859, said Joshua Day was, by the county court of Logan county, appointed guardian of the complainant, who was then an infant, and qualified by giving bond in the penal sum of $3500, with said John D. Gillett as surety. April 24, 1860, Gillett required, and Day gave him, a mortgage on his farm, in Logan county, to indemnify him, Gillett, as such surety, which mortgage was duly recorded. Day made several reports of his guardianship to the county court, and on June 22, 1869, made final report, showing in his hands, as such guardian, $2695.41, and complainant being then of age, said county court made an order directing said guardian to pay over to said ward that amount, less $18 costs paid, and file his voucher for such payment, and upon the filing of which he was to be discharged. On the 22d day of July, 1870, Wiley filed in the office of the clerk of the county court of Logan county the following receipt:

"Received of Joshua Day, guardian of John E. Wiley, the sum of twenty-six hundred and seventy-seven dollars, this July 1, 1869.

his<br>JOHN  X  E. WILEY."<br>mark.

Thereupon, the following entry or order of said county court was made of record: "Minor heir of Daniel Wiley, deceased. Joshua Day, guardian of John E. Wiley, minor heir of said deceased, presented vouchers for payment ordered heretofore, and the same having been examined by the court, it is ordered by the court that said vouchers be filed, and the guardian be, and is hereby, discharged from said guardianship." Some time afterwards Day requested Gillett to release the mortgage on his farm, telling him that full settlement had been made with said ward, and he had obtained his discharge from the county court as guardian of said Wiley. Gillett went to the county clerk's office, and was there informed of the fact that Day was discharged as the guardian of John E. Wiley, and, acting upon such information, on November 30, 1872, released the mortgage given to indemnify him as surety of said Day on said guardian's bond. Shortly after the release of said mortgage, said Day conveyed said lands, and became insolvent in 1879, and has ever since continued to be insolvent.

It is shown that at about the age of seventeen years the defendant became afflicted with chorea, or St. Vitus dance, and also, to some extent, addicted to the use of intoxicating liquor. The night before the day upon which the receipt was signed, the complainant had been to a dance, and had been drinking. Just prior to the signing of the receipt he was lying on the floor, at Day's house, asleep. Day awakened him out of his sleep, and there is a conflict in the evidence as to what then occurred. Complainant testifies: "I was lying asleep upon the floor. He got me up and told me to sign a paper. I asked him what it was. He said it was a note. I asked him to give it to me. He said if I had it I would lose it, and that he would put it in his books and keep it. He put it away in his books, and kept it." There is also evidence tending to show that complainant's habits and illness had to some extent impaired his mind. He could read writing, but did not attempt to read the paper he signed, believing, as he says, that Day told him

the truth.   Day never, in fact, paid him any portion of the
money in his hands.   On the other hand, there is much evi-
dence tending to show that complainant knew Day was his
guardian, and had money in his hands belonging to complain-
ant, and that at the time of signing said receipt, Day told him
(Wiley) that he wanted him to sign the receipt for the money
he (Day) owed him, (Wiley,) to enable Day to settle with the
court, and release the mortgage that Gillett held on his (Day's)
land.   Complainant denies that he knew that Day was his
guardian, or that he had money in his hands belonging to him,
until some time in 1881.   Complainant became of age in the
spring of 1869, and from the time he was eight years old lived
in the family of Day, until the spring of 1881, when he and
Day had a falling out.   The other facts necessary to an under-
standing of the case are stated in the opinion.

Messrs. BLINN & HOBLITT, for the appellant:

It is not necessary, in order to constitute an equitable es-
toppel, that the party should design to mislead.   It is enough
if the act or declaration was calculated to, and did, in fact,
mislead another who acted in good faith and with reasonable
diligence.   *Rosenthal* v. *Mayhugh*, 33 Ohio St. 168; *Bail* v.
*Wait*, 69 N. Y. 115; Bigelow on Estoppel, 556.

An equitable estoppel will arise by the negligent acts and
declarations of a party, even though ignorant of the truth of
his acts or declarations.   Bigelow on Estoppel, 540; *Beards-
ley* v. *Foot*, 14 Ohio St. 416; *Smith* v. *Newton*, 38 Ill. 236;
*Calhoun* v. *Richardson*, 30 Conn. 210.

It is such negligence for one who can read writing, to sign
a paper without reading it, that the law will not permit him
to say either that he believed he was signing a different paper,
or was induced to sign it by fraudulent representations, as
against the rights of one who is innocent and free from neg-
ligence.   *Douglass* v. *Matting*, 29 Iowa, 498; *Chapman* v. *Rose*,

56 N. Y. 137; *Nebeker* v. *Catzinger*, 48 Ind. 440; *Foster* v. *McKinnon*, 38 L. J. 310.

The decisions of the cases cited above are not limited to commercial paper. *Seeright* v. *Fletcher*, 6 Blackf. 380; *Miller* v. *Sullivan & Co.* 26 Ohio St. 640.

Wiley is estopped, as against the surety upon his former guardian's bond, by his neglect, for twelve years after giving the receipt, to assert his rights, and after Day had become insolvent.

Mr. S. L. WALLACE, and Messrs. BEACH & HODNETT, for the appellee:

The suit can be maintained until the Statute of Limitations runs on the bond. *Gilbert* v. *Guptil*, 34 Ill. 112; *Scheel* v. *Eidman*, 77 id. 301; *Bard* v. *Wood*, 3 Metc. 24; *Clark* v. *Clay*, 11 Fost. 393; *Crane* v. *Barnes*, 1 Md. Ch. 151; *Wade* v. *Lobdell*, 4 Cush. 510.

The limitation law in force at the time the bond was executed, controls. *Scheel* v. *Eidman*, 77 Ill. 301; *Beesley* v. *Spencer*, 25 id. 216.

The Limitation act of 1872 is prospective in its operation, and does not apply to causes of action that accrued prior to that time. *Dickson* v. *Railroad Co.* 77 Ill. 331.

Transactions between guardian and ward before discharge of the guardian, are void, as against public policy. Story's Eq. Jur. sec. 301; *Hatch* v. *Hatch*, 9 Ves. 296; *Johnston* v. *Johnston*, 2 Hill's Ch. 277; *Say* v. *Barnes*, 4 S. & R. 112; 8 Am. Dec. 679; *Fish* v. *Miller*, 1 Hoffm. Ch. 267; *Elliott* v. *Elliott*, 5 Binn. 8; *In re Van Horn*, 7 Paige, 46; *Stanley's Appeal*, 8 Barr, 431; *Sullivan* v. *Blackwell*, 28 Miss. 724; *Wells' Appeal*, 10 Harr. 325; *Ebert* v. *Ebert*, 5 P. F. Smith, 110; *Long* v. *Mulford*, 17 Ohio, (N. S.) 484; *Harris* v. *Carstarphen*, 69 N. C. 416.

Courts look upon settlements made by guardians with wards recently come of age, with distrust, and will not consider them

binding unless made with the fullest deliberation, and the most abundant good faith on the part of the guardian. *Sullivan* v. *Blackwell*, 28 Miss. 737; *Richardson* v. *Linney*, 7 B. Mon. 571; *Wright* v. *Arnold*, 14 id. 638; *Andrews* v. *Jones*, 10 Ala. 400; *Spalding* v. *Brent*, 5 Md. Ch. 411; *McClellan* v. *Kennedy*, 8 Md. 230; *Meek* v. *Perry*, 36 Miss. 190; *Williams* v. *Powell*, 1 Ired. Eq. 460; *Boyett* v. *Hurst*, 1 Jones' Eq. 166; *Hawkins' Appeal*, 32 Pa. St. 263; Story's Eq. Jur. secs. 317, 318; Perry on Trusts, (1st ed.) sec. 200, p. 173.

There is no difference between principal and surety, as regards their liability on a bond. The same act or neglect which charges the principal must charge the surety. *Seaver* v. *Young*, 16 Vt. 658; *Roth* v. *Miller*, 15 S. & R. 100; *Hobbs* v. *Middleton*, 4 J. J. Marsh. 176.

Any act of the principal which estops him from setting up a defense personal to himself, operates equally against his sureties. *Chicago* v. *Gage*, 95 Ill. 606; *Davis* v. *Hoops*, 33 Miss. 173; *McCabe* v. *Ramey*, 32 Ind. 309; *Stovall* v. *Bank*, 10 Wall. 583; *United States* v. *Girault*, 11 How. 27; *Bank* v. *Elwood*, 21 N. Y. 90; *Belloni* v. *Freeman*, 63 id. 387; *Gilbert* v. *Isham*, 16 Conn. 525; *Patterson's Appeal*, 48 Pa. St. 345; *Patterson* v. *Guardians of the Poor*, 38 Eng. L. and Eq. 440; *Evans* v. *Keeland*, 9 Ala. 42; *Wells* v. *Gallaher*, 46 Pa. St. 205; *Baker* v. *Preston*, 1 Gilmer, 235; *State* v. *Granmer*, 29 Ind. 530; *Pinkstaff* v. *People*, 59 Ill. 148; *Commissioners* v. *Mayrant*, 2 Brev. 228; *Ream* v. *Lynch*, 7 Bradw. 161; *Roper* v. *Sangamon Lodge*, 91 Ill. 518; *Fogarty* v. *Ream*, 100 id. 366.

A guardian's discharge is no bar to opening his accounts in relation to his trust, at the suit of the ward. *Runkle* v. *Gale*, 3 Halst. Eq. 101; *Stark* v. *Gamble*, 43 N. H. 465.

The surety is not discharged by the fraud of the principal. *United States* v. *Girault*, 11 How. 27.

A receipt given by the ward to the guardian is no bar to a suit. *Bennett* v. *Hanifan*, 87 Ill. 31; *Brewer* v. *Vanarsdale*,

6 Dana, 204; *Hall* v. *Cone*, 5 Day, 543; *Fish* v. *Miller*, 1 Hoffm. Ch. 267; Schouler on Domestic Relations, sec. 372.

The equity of the surety depends upon the relation between himself and his principal, and has no operation on a contract with a creditor. 2 White's Tudor's Lead. Cases in Eq. p. 2; *Supervisors* v. *Otis*, 62 N. Y. 88; *Harris* v. *Newell*, 42 Wis. 687.

It is the duty of a surety of a guardian to make inquiries, and see that his principal discharges the obligation resting upon him. *Forester* v. *State*, 46 Md. 154.

A party knowing the relation existing between a guardian and ward, is bound to know the infirmity of a contract between them, and acts in relation thereto, at his peril. *Sherry* v. *Sansberry*, 3 Ind. 330; *Gale* v. *Wells*, 12 Barb. 84; Schouler on Domestic Relations, sec. 389.

The ward, to be barred by his own acts in all transactions with his guardian, must have acted, after the termination of his disability, with deliberation, and on full knowledge of the essential facts. *Fish* v. *Miller*, 1 Hoffm. Ch. 267; *Benion* v. *Miller*, 27 Ga. 78; *Scott* v. *Freeland*, 7 S. & M. 409; *Hume* v. *Hume*, 3 Barr, 144; *Worrell's Appeal*, 23 Pa. St. 44; *Sherry* v. *Sansberry*, 3 Ind. 320; *Trader* v. *Lowe*, 45 Md. 1; *Ferguson* v. *Lowery*, 54 Ala. 510; *Singleton* v. *Love*, 1 Head, 357; *Lee* v. *Brown*, 4 Ves. 361; *Cory* v. *Gertcken*, 2 Madd. 362.

Before Wiley can be bound by any rights of Gillett, it must be shown that he knew that Gillett was Day's surety at the time Day obtained the receipt, and that Gillett would be injured thereby. *Wilson* v. *Foot*, 11 Metc. 285; *Hollier* v. *Eyre*, 9 C. C. & F. 1; *Gahn* v. *Neimcewicz*, 3 Paige, 614; 11 Wend. 312; *Elwood* v. *Deedendorf*, 5 Barb. 398; *Agnew* v. *Merritt*, 10 Minn. 308; *Kaign* v. *Fuller*, 1 McCarter, 419; *Martin* v. *Taylor*, 8 Bush, 384; *Burke* v. *Cruzer*, 8 Texas, 66; *Miller* v. *Dyer*, 1 Duv. 263.

That a creditor had notice of the rights of the surety is not presumed, but must be proved. *Agnew* v. *Merritt*, 10 Minn. 308; *Dorlarque* v. *Cress*, 71 Ill. 380.

A party, to be estopped, must have knowledge of the rights of the person who claims the estoppel. *Howell* v. *Lawrenceville*, 31 Ga. 633; *Neel* v. *Harding*, 2 Metc. 247; *McGee* v. *Metcalf*, 20 Miss. 535; *Nichols* v. *Parsons*, 6 N. H. 30; *Debury* v. *Adams*, 9 Yerg. 52; *Piper* v. *Gilmore*, 49 Me. 149; *Andrew* v. *Lyons*, 11 Allen, 349; *Whitaker* v. *Williams*, 20 Conn. 98; *Dorlarque* v. *Cress*, 71 Ill. 380; *Davenport* v. *King*, 63 Ind. 64.

In order to constitute an estoppel, there must be an intention that the opposite party should act on the statement. *Kuhl* v. *Mayor*, 23 N. J. Eq. 84; *Turner* v. *Griffin*, 12 Allen, 401; *Piper* v. *Gilmore*, 49 Me. 149; *Wilcox* v. *Howell*, 44 N. Y. 398; *Clarke* v. *Hart*, 6 H. L. Cas. 633; *People* v. *Brown*, 67 Ill. 435; *Taylor* v. *Ely*, 25 Conn. 250; Bigelow on Estoppel, 60, 437; Herman on Estoppel, 327, 331, 426; *Donaldson* v. *Hall*, 2 Daly, 325; *Martin* v. *Zellerbach*, 38 Cal. 300; *In re Railway Co.* L. R. 3 Q. B. 584; *McAfferty* v. *Conover*, 7 Ohio St. 99; *Freeman* v. *Cook*, Exch. 654.

Any act of the principal which works a forfeiture of his bond, forfeits the bond, also, as to his surety. *Wayne* v. *Commercial Nat. Bank*, 52 Pa. 631.

A receipt given does not estop the party giving it, even though it may be acted upon, unless the party giving it knew it would be acted upon. *Kuhl* v. *Mayor*, 23 N. J. Eq. 84.

A signature obtained by fraud is the same as a forged signature. *Wade* v. *Lobdell*, 4 Cush. 510; 20 Pick. 321.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The last account of the guardian, filed in the county court June 22, 1869, just after his ward's majority, shows in the guardian's hands the sum of $2695.41, belonging to the ward, which was directed by the court to be paid to the ward, less the sum of $18 costs. It is conceded that the guardian never, at any time, paid any portion of the money to the ward, but on July 22, 1870, he filed his ward's receipt for $2677, dated July 1, 1869, and procured an order of the county

court for his final discharge as guardian. There was no citation of the ward, nor was he present, or given notice of such proceedings. An order had been previously entered by the county court requiring said guardian to pay over to his ward the sum of money in his hands, less the costs before mentioned, and such order is conclusive upon the guardian and his security upon his bond, except for fraud or mistake, as to the amount then actually in the hands of the guardian. *Ammons* v. *People,* 11 Ill. 6; *Ralston et al.* v. *Wood,* 15 id. 159.

The complainant's receipt, filed by the guardian, is *prima facie* evidence that his guardian, on or before July 1, 1869, paid him the sum of $2677, but is not conclusive. Like any other receipt, it is open to explanation or contradiction. (*Scott* v. *Bennett,* 3 Gilm. 243; *Walrath* v. *Norton,* 5 id. 437; *Frink* v. *Bolton,* 15 Ill. 343.) The evidence clearly establishes that the receipt is not true, and that the guardian never, in fact, paid the complainant said sum, or any part of it, and that there had at no time been a settlement between the guardian and ward. This, of itself, is sufficient to fix the liability of appellant, who was surety on the guardian's bond, unless he has shown something which exonerates him, or which, in equity, will defeat the right of complainant to the relief sought.

No discussion of the facts as to whether, at the time of the execution of the receipt mentioned, the ward understood the purport of that instrument, will be entered upon. He testifies, that he was told that it was a note his guardian wished him to sign, and that he signed it without reading it, relying upon such statement. The evidence showing the contrary is shown to be so unreliable in its character as to entitle it to little or no weight or consideration. It may therefore be assumed as a fact, that the receipt upon which the order of court was predicated, was obtained by said Day, guardian, by falsely representing to his ward that the paper presented for his signature was a note his guardian desired him to sign.

It is claimed that in giving this receipt by the ward to his guardian, he failed to exercise proper care and caution in ascertaining the nature and effect of the instrument signed, and that he thereby put it in the power of the guardian to practice a fraud upon the court in procuring the order of discharge, and upon appellant, by means of such order and receipt, whereby appellant was induced to release his security, and that the ward should therefore be estopped from asserting the liability of such surety on said bond, and that complainant's *laches* are, in equity, sufficient to defeat the relief sought. It is clear, however, that the guardian owed his ward a duty, which could be discharged only by performance of the condition of his bond, and that no one except the ward had power to release the obligation of the guardian or his surety. Before the county court could enter its order discharging the guardian, it must appear to that court that the guardian had complied with its former order, and paid over to his ward all money in his hands belonging to said ward. Under the circumstances here shown, the mere order of the county court would not avail to release the guardian from his obligation to account to his ward, and if the guardian is not released by it, it is equally clear that the surety would not thereby be released. If a dishonest guardian could file an *ex parte* account, showing payment in full to his ward, and by forged receipts, or receipts procured by fraud and circumvention, obtain an order of discharge, without notice to the ward, and thereby satisfy or defeat the condition of his bond requiring him to pay over to the ward the estate of the ward in his hands, it would defeat the purpose of the law in requiring such bonds, with security.

The principal contention, however, arises out of the fact that appellant had taken a mortgage upon the guardian's land to indemnify himself against loss by reason of his suretyship on said guardian's bond, and that by reason of said receipt, and the order of court thereby procured, and in reliance thereon, appellant was led to change his condition, and give up his se-

curity against loss by reason of his suretyship for said guardian; and it is contended, that as, by giving the receipt, the ward aided his guardian in practicing a fraud upon appellant, he should be estopped from now disputing the validity and fairness of his receipt, and that he alone should suffer the consequences of his own want of due and proper care and circumspection in signing said receipt.

The doctrine of *estoppel in pais* is never applied except where it would be contrary to equity to allow the assertion of the right, or proof of the fact, to avail. It is never applied to one who is without fault, or who has not, by some act or declaration, or by silence when he should speak, induced another to alter his condition on the faith of such acts or the truth of such declarations. The facts which give rise to an estoppel must be such as to make it unjust and inequitable to allow the party estopped to assert what would otherwise be his right, or make proof of matters tending to establish such right. Its effect is the forfeiture of a pre-existing right, or the exclusion of evidence of such right. At the time of the execution of this receipt by Wiley, it is apparent that he had no knowledge that appellant was security on the guardian's bond, or that the security on such bond, whoever he might be, had taken a mortgage or other security from Day. Wiley so testifies, and is uncontradicted by any credible testimony. It is therefore evident that he could have had no purpose, in executing said receipt, of aiding said Day in perpetrating a fraud upon the security on such bond, even if he had known that he was executing a receipt. The ward owed no' duty to appellant; made no statement or declaration to appellant to influence his conduct. Instead of giving the receipt to deceive appellant, and induce him to believe that the guardian had paid him, he was himself the victim of fraud and deception.

It was said by this court in *People* v. *Brown,* 67 Ill. 436, that "the doctrine on this subject we understand to be, that when a person, by his words or conduct, *voluntarily* causes

another to believe in the existence of a state of things, and induces him to act upon that belief, so as to change his previous position, he will be estopped to aver against the latter a different state of things." It is clearly apparent in this case that there was no voluntary act of Wiley which could have misled appellant, or induced him to part with his security. The act of Wiley was procured by fraud and misrepresentation of his guardian, for the faithful performance of whose duty appellant was surety. The mind of Wiley never assented to the execution of the receipt as an acknowledgment of having received the money therein mentioned. What he voluntarily did was to execute what he supposed to be a promissory note. It is not essential to the creation of estoppel that there should be an actual fraudulent intent at the time of making the declarations or performing the act upon which the other party has relied, but it is essential that there should be voluntary acts or declarations by which another is made to believe in the existence of certain facts, and which induce him to act upon that belief. *Picard* v. *Sears*, 6 A. & E. 469 ; *Freeman* v. *Cook*, 2 Ex. 654 ; *Cornish* v. *Abbingdon*, 4 Hurl. & N. 549 ; *People* v. *Brown, supra ; Powell* v. *Rogers*, 105 Ill. 318.

The cases and text writers seem to use interchangeably the words "willfully," "intentionally," "means" and "voluntarily" as synonymous terms in discussing the question of the making of declarations or performing acts from which it is alleged an estoppel arises. The rule, as gathered from the various cases in respect of this element of estoppel, perhaps is, that where one voluntarily, by acts or declarations, represents a certain state of facts to exist, and thereby procures a change of conduct in another, he can not afterwards be heard to assert a contrary state of facts, if injury results to or fraud is perpetrated thereby upon the party who had acted relying upon the truth of his representations. It is, however, claimed "that an equitable estoppel will arise by the negligent act and conduct of a party, even though ignorant of the truth of his declaration."

It is said in Bigelow on Estoppel, p. 540: "It seems to be settled that a party's ignorance of the truth of the representation will not remove the estoppel if his ignorance is the result of gross negligence." It is urged that it was gross negligence for Wiley to sign the paper produced as a receipt, without informing himself as to the contents thereof. We have seen that he was ignorant of the fact that he was making any representation or acknowledgment of payment by the guardian. His negligence, if any is attributable to him, was in relying upon the statement of Day as to the contents of said paper. It, however, appears that appellee's father died in 1856; that appellee was then about eight years old; that on March 23, 1859, Day was appointed guardian, and took appellee to his (Day's) home, where the ward continued to reside as a member of the guardian's family until after he became of age, and until the spring of 1881. When the signature was procured to the receipt, the ward was still an inmate of his guardian's family, and had just arrived at his majority. He would not be expected to distrust his guardian or question the truthfulness of his representations. Appellee says he had every confidence in his guardian, and the facts and circumstances shown tend to corroborate his statement. He was assured that the paper he was asked to sign was a note, and having been just awakened from sleep, did not read the paper before affixing his mark to it. That we can now see how utterly unworthy of confidence this guardian was, and how recreant to every trust and confidence reposed in him, furnishes no criterion for determining the condition of appellee's mind in this respect. Considering, as we must, the confidential and intimate relations existing between appellee and his guardian, with whom he had had no settlement or talk of settlement of the ward's affairs, it can not be said that there was anything to apprise appellee that he might be acknowledging payment by the guardian, or that would put him upon inquiry in that regard. It is to be remembered that this boy, while having a considerable patrimony, had been

reared in ignorance, and allowed to fall into vicious habits, and, in addition, had, several years prior to his arriving at majority, become afflicted with a nervous disease, that, to some degree, impaired his mental faculties. If it be conceded that appellee knew that Day was his guardian, or that Day had money in his hands belonging to appellee, what was there to induce appellee to believe that the signing of this particular paper had anything to do with the matter of his estate? Manifestly, nothing whatever.

Ordinarily, one having the means of information as to the contents of a paper executed by him, will, as against third persons, be held to have known the contents, and will not be permitted to assert his ignorance of its contents to avoid responsibility according to its real import. Here, however, the signing of this receipt was the will and act of the guardian, rather than that of appellee. Courts will watch settlements of guardians with their wards, or any act or transaction between them affecting the estate of the ward, with great jealousy. From the confidential relation between the parties, it will be presumed that the ward was acting under the influence of the guardian, and all transactions between them, prejudicially affecting the interests of the ward, will be held to be constructively fraudulent. (*Carter* v. *Tice et al.* 120 Ill. 277.) The doctrine is thus stated in 1 Story's Eq. Jur. sec. 217: Where the guardianship has, in fact, ceased, by the majority of the ward, the courts "will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased, and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward and the most abundant good faith on the part of the guardian, for, in all such cases, the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have

not ceased,—as, if the accounts between the parties have not been fully settled, or if the estate still remains, in some sort, under the control of the guardian."

It is seen that the presumption of influence on the part of the guardian, and the dependence of the ward, continues after the legal condition of guardianship has ended, and transactions between them, during the continuance of the presumed influence of the guardian, will be set aside, unless shown to have been the deliberate act of the ward, after full knowledge of his rights. In all such cases, "the burden rests heavily upon the guardian to prove the circumstances of knowledge and free consent on the part of the ward, good faith and absence of influence, which alone can overcome this presumption." (2 Pomeroy's Eq. 961, and authorities cited.) It is not only shown as a fact, but will be presumed from the circumstances here shown, that undue influence was exercised by the guardian in procuring the receipt of his ward. The act, then, was the act of the guardian,—the carrying into effect of his will, to which the mind of the ward was subordinated. In no just sense can it be said that a party thus circumstanced has been guilty of negligence. To bind the ward it should appear that he acted after the termination of his disability, with deliberation, and with full knowledge of all material facts. *Fish* v. *Miller*, 1 Hoffm. Ch. 267; *Scott* v. *Freeland*, 7 S. & M. 409; *Sherry* v. *Sausburry*, 3 Ind. 320; *Trader* v. *Low*, 45 Md. 1; *Ferguson* v. *Lowery*, 54 Ala. 510; *Garvan* v. *Williams*, 44 Mo. 465; *Harris* v. *Christopher*, 69 N. C. 416; *Wade* v. *Lobdell*, 4 Cush. 510.

Nor can it be said that appellant was a third party, charged with no duty in respect of the matters here being considered. He was under contract obligation to the ward to the extent of the money coming into the hands of the guardian, and had undertaken that the guardian would faithfully perform his duty in respect thereof. He is presumed to have known the law, and therefore must have known that the order of the county court was liable to be set aside for fraud, or any in-

firmity in the dealing between the guardian and ward. He was required to know that nothing short of the actual payment of the money in his hands would release the guardian from his liability as such, and that, in the event of said order being set aside, the guardian would be liable to account to said ward. He is shown to have known that the ward had been, and was then, a member of the guardian's family, and had but recently attained his majority. Common prudence would therefore dictate that further inquiry should be made than merely looking to the record and the receipt before releasing his indemnity. The ward was in the neighborhood, and could have readily been seen and inquired of as to whether or not he had been paid. To hold otherwise, would be to put it in the power of every insolvent guardian who may have given security to his bondsmen, to despoil his ward of his estate, and then, by fraud or undue influence, procure the simple receipt of his ward, and thereby discharge the liability of the security upon the guardian's bond.

But it is said, that where one of two innocent persons must suffer by the fraud of a third person who owed a duty to both, he who put it in the power of the third person to commit the fraud must bear the loss, rather than the other. It is contended, that appellee, by giving the receipt, enabled the guardian to impose upon the court and appellant, and the principle mentioned is sought to be invoked against him. As we have seen, he did not knowingly give the receipt, nor did he have any knowledge that appellant held a mortgage or other security against loss by reason of his suretyship, and was not guilty of negligence with which he was chargeable in signing said receipt. The object of requiring a bond with security, is to protect the ward from the fraud and dishonesty of his guardian, no less than against his insolvency, and to allow the surety to escape liability through the very fraud of his principal which he was under contract obligation to protect the ward against, would be to establish a most dangerous precedent, and render

such bond unavailing as a protection to the ward, and defeat the purpose of the law in requiring guardians to give bond with security. In *Forrester* v. *State*, 46 Md. 154, it is said, "that it is the duty of sureties on the bond of the guardian to make inquiry, and see that their principal discharges the obligation resting upon him, whether he be solvent or insolvent." It was the duty of appellant, as it is of the courts, to scrutinize with care the transactions between the ward and the guardian for whom he is surety. When, by the exercise of reasonable care and diligence, the fact can be ascertained, he should be held to know of any infirmity in the dealings of the guardian with his ward. While full faith and credit must be given to the public records, and those relying upon and dealing in view of them will ordinarily be protected, the record of discharge of the guardian by the county court will not protect the guardian, or the surety on the guardian's bond, if such order is procured by the fraud of the guardian. In view of the facts of this case, it must be held that the negligence of the surety in not determining what was the truth, when the means of ascertaining the same was readily at hand, was the occasion of his loss, if loss he must suffer.

The delay of appellee in bringing this bill is set up and relied upon as *laches,* which should defeat the relief sought. The bill was not filed until twelve years after the right of action accrued. The statutory limitation to suits upon the bond then in force was sixteen years. Courts of equity, in enforcing rights of the ward as against the surety, will, unless there is some equitable reason for the adoption of a different period, adopt the limitation fixed by the statute. (*Scheel et al.* v. *Eidman et al.* 77 Ill. 301.) In cases of fraud, the limitation will begin to run only from the discovery of the fraud, or from the time when the fraud could have been discovered by the exercise of reasonable diligence; but it is well settled, that the failure to use such diligence may be excused when there exists a relation of trust and confidence between the parties,

rendering it the duty of the party committing the fraud to disclose to the other the truth, and where it was through the acts of the former that the latter was induced to refrain from inquiry. (Bigelow on Fraud, 445; 2 Perry on Trusts, sec. 805; *Atlantic Bank* v. *Harris*, 118 Mass. 147; *Wear* v. *Skinner*, 46 Md. 257.) Here, the suit was brought within the limitation of actions on the bond, and while the court may, for equitable reasons, adopt a less period of limitation, they will do so only when equity demands it. We see no reason in this case for departing from the general rule. It is true that the guardian became insolvent, as appellant says, in 1879; but appellee remained a member of the guardian's family, and under his influence and control until 1881, and that he was subjected to and dominated by the will of the guardian, is, we think, apparent. In 1880, appellant testifies, appellee wrote him a letter demanding money that Day owed to appellee. It appears that appellant knew that appellee was living at Day's at the time of the release of the mortgage, and long subsequently,—that he had seen Wiley occasionally, and knew of his physical affliction. It is shown that when Wiley became of age "he was a drunken spendthrift." In view of the facts disclosed, we are not prepared to say that good conscience requires the application of the doctrine of *laches*.

Finding no error in this record, the judgment of the Appellate Court is affirmed.                    *Judgment affirmed.*